# IN THE COURT OF APPEALS
# OF THE
# STATE OF MISSISSIPPI

### NO. 97-KA-01288-COA

**JEREMIAH ROBINSON**                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/1997 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | THOMAS M. FORTNER |
| | ROBERT M. RYAN |
| | ANDRE' DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF UTTERING FORGERY-2 COUNTS SENTENCED TO 12 YEARS/COUNTS TO RUN CONCURRENT, BUT CONSECUTIVE TO OTHER SENTENCE(S) PRESENTLY BEING SERVED IN MDOC |
| DISPOSITION: | AFFIRMED - 06/08/1999 |
| MOTION FOR REHEARING FILED: | 6/21/99; denied 09/14/99 |
| CERTIORARI FILED: | 09/29/99; granted 12/09/99 |
| MANDATE ISSUED: | |

BEFORE KING, P.J., BRIDGES, AND LEE, JJ.

LEE, J., FOR THE COURT:

¶1. On September 26, 1997, Jeremiah Robinson was found guilty on two counts for the felony offenses of uttering a forgery, against the peace and dignity of the State of Mississippi. From these convictions, Jeremiah Robinson perfects his appeal to this Court and argues that the following errors were committed

during the course of his trial: (1) the trial court erred in not granting the defense request for a directed verdict at the close of the prosecution's case-in-chief, (2) he was denied his fundamental constitutional right to confront the witnesses against him as guaranteed by the United States and Mississippi Constitution, (3) the trial court erred in not granting the defense motion to dismiss for failure to provide him a speedy trial, (4) the prosecution exercised its peremptory jury challenges in a racially discriminatory manner. Finding his arguments without merit, we affirm.

## FACTS

¶2. On August 4, 1994, Jeremiah Robinson was collecting campaign funds for a political candidate running in a sheriff's campaign. Robinson had sought a campaign contribution from Gus Primos, owner of Lakeland Development. Gus Primos agreed to make a contribution, and Robinson went to Lakeland Development to speak with Gus Primos and obtain the campaign contribution.

¶3. Gus Primos authorized his personal secretary to issue a check in the sum of two hundred and fifty dollars to benefit the campaign. Upon Robinson's arrival, the secretary pulled out the checkbook ledger which contained the personal checks of Gus Primos. Each page of the checkbook ledger contained three checks to a page. The secretary issued a check for the campaign in the sum of two hundred and fifty dollars, but she still needed to obtain Gus Primos's signature on the check.

¶4. The secretary left her office and Robinson to obtain the necessary signature with the checkbook ledger still open on her desktop. Testimony revealed that when the secretary left the desk Robinson was the only individual in the office. The secretary obtained Gus Primos's signature on the check; however, while she was doing so Gus Primos decided he wanted to meet the person collecting the campaign contributions. Gus Primos introduced himself and gave Robinson the check, and shortly thereafter, Robinson left the office of Lakeland Development. It was not until Lakeland Development received its monthly bank statement and the secretary was reconciling the account did she discover there was a problem.

¶5. The secretary discovered that two out-of-sequence checks which purported to have been issued by Gus Primos to Robinson had been cashed by Robinson. The first check was issued to Robinson in the sum of eight hundred dollars and was cashed by Robinson at the Trustmark branch located in the Kroger Super Store on Raymond Road. The second check was issued to Robinson in the sum of one thousand five hundred dollars and was cashed at the Poindexter Branch of Trustmark Bank.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENSE REQUEST FOR A DIRECTED VERDICT AT THE CLOSE OF THE PROSECUTION'S CASE-IN-CHIEF AS THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT EACH ELEMENT OF THE INDICTED OFFENSES.

¶6. The first assignment of error was that the trial court erred in denying the defense's request for a directed verdict at the close of the prosecution's case-in-chief as the State failed to prove beyond a reasonable doubt each element of the indicted offenses. Objections to the denial of a directed verdict challenge the sufficiency of the evidence. Our standard for reviewing challenges to convictions based on sufficiency of the

evidence is well-established.

¶7. When considering a motion for a directed verdict, this Court must consider the evidence introduced in the light most favorable to the State, accepting all evidence introduced by the State as true, together with all reasonable inferences therefrom. *McClain v. State,* 625 So. 2d 774, 778 (Miss. 1993). If there is sufficient evidence to support a guilty verdict, the motion for a directed verdict must be overruled. *Smith v. State,* 646 So. 2d 538, 542 (Miss. 1994) (citations omitted). To test the sufficiency of the evidence,

> [W]e must, with respect to each element of the offense, consider all of the evidence - not just the evidence which supports the case for the prosecution - in the light most favorable to the verdict. The credible evidence which is consistent with guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair minded jurors could only find the accused not guilty.

*Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987) (citations omitted).

¶8. The crime which Robinson is charged is defined in Mississippi Code Annotated § 97-21-59 (Rev. 1994), and reads as follows:

> Every person who shall be convicted of having uttered or published as true, and with intent to defraud, any forged, altered, or counterfeit instrument, or any counterfeit gold or silver coin, the forgery, altering, or counterfeiting of which is declared by the provisions of this chapter to be an offense, knowing such instrument or coin to be forged, altered, or counterfeited, shall suffer the punishment herein provided for forgery.

Defense counsel argues that the State failed to prove that the checks were forgeries and when the instruments were passed that Robinson knew them to have been forged. The aforementioned elements were proven by the State and met the standard provided to overcome the requirement of the trial judge granting a directed verdict.

¶9. During the trial of this matter, the State called the secretary for Lakeland Development to testify. The testimony offered by the secretary pertained to the system of business conducted at Lakeland Development and the subject forged checks which had been issued to and cashed by Robinson. Testimony revealed that Lakeland Development had a strict routine in regards to their procedures for writing checks. If the secretary did not write the checks herself and deliver them to Gus Primos for his signature, then Gus Primos notified her that he had taken a check, and she would initial the ledger receipt for documentation of its use. The secretary at Lakeland Development further testified that because of their sequence the checks came to her attention when she was reviewing the monthly bank statement. The business had not reached those check numbers in the checkbook ledger. The checks cashed by Robinson were out of the numbering sequence in the checkbook ledger by the difference of about one hundred. Further investigation by the secretary revealed that the checks issued to Robinson coincided with a page of checks missing from the checkbook ledger. Upon inspection the secretary discovered that the checks were not in the handwriting of her or Gus Primos. Once the secretary reported this discrepancy of routine to Gus Primos they reported the checks as stolen to the Flowood Police station.

¶10. At trial, the State presented the secretary with copies of the two checks which had been cashed by Jeremiah Robinson and asked her to identify the handwriting on the check. The secretary testified that the writing on the check was neither hers nor Gus Primos. The secretary was able to testify that the handwriting and signatures were not Gus Primos based on the past five and one-half years of her daily business routine and contact with Gus Primos. The secretary testified that she saw Gus Primos signature "one hundred times a day." Robinson argues that the testimony relative to the authentication and identification of Gus Primos's handwriting was not admissible.

¶11. Mississippi Rule of Evidence 901 (a) and (b)(2) states as follows:

> (a) **General Provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that a matter in question is what is proponent claims.

> (b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule.

> (2) *Nonexpert Opinion on Handwriting.* Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

The defense argues that this testimony was presented without a proper foundation. While the rule does not set out a definitive criteria for the admissibility of evidence when introduced by a nonexpert witness there is common law which may be used as a guide. In *Wiggins v. State*, 224 Miss. 414, 420, 80 So. 2d 17, 19 (1955), the Mississippi Supreme Court held a letter was admissible through the testimony and identification of a nonexpert witness who testified they were familiar with the questioned handwriting. "A witness, who in the course of official business or in any other way has acquired by experience a knowledge of a person's handwriting, may state his opinion as to whether a particular writing was made by such person." *Id.* at 19 (citation omitted). In *McCarty v. Love*, 145 Miss. 330, 110 So. 795, 796 (1927), this guideline was reiterated by the Mississippi Supreme Court. In *Love*, the court stated that it is not necessary for a handwriting witness to be an expert. "The unskilled may give an opinion as to the genuineness of a signature, based on actual knowledge of the handwriting of the person whose signature is in question." *Id*. In light of the aforementioned testimony of the secretary, and the common law guidelines for the admissibility of nonexpert, handwriting testimony the testimony was admissible and credible.

¶12. In addition, the State called Brenda Brown and Wayne Humphries, employees of Trustmark National Bank. The testimony of Brown and Humphries established that Robinson was the individual who presented the checks and received the sums of money.

¶13. Considering all of the evidence in the record as true, in the light most favorable to the verdict, and giving the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence, reasonable men could have found from the facts presented through the trial testimony that all of the elements were satisfied to find Jeremiah Robinson guilty of two counts of uttering a forgery. We, therefore, find no reversible error committed by the trial court.

## II. WHETHER ROBINSON WAS UNFAIRLY DENIED HIS FUNDAMENTAL CONSTITUTIONAL RIGHT TO CONFRONT WITNESSES AGAINST HIM AS GUARANTEED BY THE UNITED STATES AND MISSISSIPPI CONSTITUTION

¶14. The second assignment of error argued by Robinson is that he was denied his constitutional right to confront witnesses against him as guaranteed by the United States and Mississippi Constitution when the State did not call Gus Primos to testify. In *Buchanan v. State*, 293 So. 2d 813, 814 (Miss. 1974) the Court restated: "[t]hat accused made or participated in the making of the forgery may be proved by either direct or circumstantial evidence. The person whose signature is forged is not an indispensable witness . . . ." With this in mind, this Court now looks at the constitutional standard applied when determining if there has been a confrontation clause violation.

¶15. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The right to confront and cross-examine witnesses and to call witnesses in one's own behalf has long been recognized as essential to due process. The United States Supreme Court further enumerated and stated that certain factors are essential to a fair trial. Among these are "[a] person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense--a right to his day in court--are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." *In re Oliver* 333 U.S. 257, 273 (1948). Robinson was afforded the aforementioned elements in the present case.

¶16. This Court has looked at the evidence that was presented by the State and Robinson was given, and in fact, took the opportunity to cross-examine each witness presented by the State, with the exception of R. D. Thaggard whom merely presented testimony establishing venue. The fact that the State did not call Gus Primos to the stand did not deprive the defendant of his constitutional right to confront witnesses against him. Additionally, Robinson had every opportunity to subpoena Primos and call him as a witness if he felt his testimony would have helped substantiate a defense. Robinson cannot mandate how the State chooses to present its case against him.

¶17. Additionally, any further arguments by the defense as to inadmissible and incompetent testimony is not supported by the record. Testimony was presented by witnesses with first hand knowledge relative to the facts to which they were testifying. The "forgery affidavit" was marked as exhibit number four; however, neither the contents of the affidavit nor the police reports were admitted into evidence at the trial of this matter; therefore, Robinson was not denied his right to confront Gus Primos on any out-of-court statements made by him. There was no violation of the confrontation clause.

## III. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENSE MOTION TO DISMISS FOR FAILURE TO PROVIDE ROBINSON A SPEEDY TRIAL.

¶18. In Robinson's third assignment of error, he argues that his constitutional right to a speedy trial was violated. After a careful chronological, substantive review of the efforts to bring this matter to trial, we disagree. For constitutional purposes, a defendant's right to a speedy trial attaches and time begins to run upon arrest. *Handley v. State*, 574 So. 2d 671, 674 (Miss. 1990). When the constitutional right to a speedy trial attaches, we are required to apply the balancing test found in *Barker v. Wingo*, 407 U.S. 514 (1972), to determine if the right to a speedy trial has been denied. *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989). The *Barker* decision lists four factors to be considered: (1) length of delay, (2) reason for delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice resulting to the defendant. "No one of the factors is, in itself, dispositive; rather they must be considered together in light of all the circumstances."*Adams v. State*, 583 So. 2d 165, 167 (Miss. 1991). In *Spencer v. State*, 592 So. 2d

1382, 1387 (Miss. 1991), the court held that a delay of eight months or longer is presumptively prejudicial but, standing alone, is insufficient for reversal. *See also Handley v. State*, 574 So. 2d 671, 676 (Miss. 1990). There was approximately a thirty-four month delay between Robinson's arrest on November 19, 1994, and the beginning of his trial on September 26, 1997. This delay requires this Court to weigh the remaining three factors, the following chronology demonstrates the available information contained in the record relative to the length of delay:

| | |
|---|---|
| Arrest (date as asserted by the defense counsel) | November 19, 1994 |
| Indictment | December 16, 1994 |
| Waiver Of Arraignment And Entry of Plea Of Non Capital Cases | March 28, 1995 |
| Motion For Discovery | March 29, 1995 |
| Capias Executed In Custody | August 27, 1995 |
| Motion To Reduce Bond | June 6, 1995 |
| Continuance | June 8, 1995 |
| Continuance | September 19, 1995 |
| Continuance | November 14, 1995 |
| Continuance | February 23, 1996 |
| Order For Mental Evaluation | March 21, 1996 |
| Continuance | April 5, 1996 |
| Trial On Another Charge | September, 1996 |
| Motion To Consolidate | September 16, 1997 |
| Motion To Vacate Conviction | September 16, 1997 |
| Motion To Consolidate Post-Conviction Relief Actions Filed in Cause Nos. 91-1-210, 91-1-211, 91-1-212, And 91-1-213. | September 16, 1997 |
| Motion To Vacate Conviction And Incorporated Memorandum Of Law | September 16, 1997 |
| Motion In Limine | September 23, 1997 |
| Motion To Dismiss For Failure Provide A Speedy Trial | September 23, 1997 |
| Trial | September 25, 1997 |

¶19. In its brief counsel for Robinson admits that prior to August 1996, a delay was caused by the defense due to plea negotiations and having sought a mental evaluation for Robinson. Additionally, during this period the record reflects delays were caused for the following reasons: (1) Robinson experienced difficulties with defense counsel, and he was represented by different attorneys on numerous pending charges, (2) requests for continuances, and (3) going to trial on other charges. During the period before Robinson's trial there were several continuances; however, there is limited information in the record relative to whether the continuances were requested by the court, the State, or Robinson.

¶20. The State in its brief states that there were agreed continuances, a request for continuance by the State, and a continuance by the trial court; however, the record does not show on what date which entity made the request. In the record on Robinson's motion for failure to have a speedy trial, the prosecuting attorney made reference to approximately four of the continuances being granted by the court at the request of defense counsel. Additionally, the State argued that the State had never asked for a continuance, and in fact, previously the State had issued three sets of subpoenas for trial. The defense made no objections to the aforementioned representations made to the court by the prosecution and, therefore, this Court will accept these representations as true. "Where a delay is caused by the defendant, the constitutional clock is tolled for that period of time. The period of delay attributable to the defendant is subtracted from the total days of delay." *Johnson v. State*, 666 So. 2d 784, 792 (Miss. 1995) (*abrogated on other grounds by Hennington v. State*, 702 So. 2d 403 (Miss. 1997). Beyond the aforementioned dates, and testimonial information as to the cause of delay, the record is devoid of further information. "The [S]tate bears the risk of non-persuasion regarding the reasons for delay and must show either that the defendant caused the delay or that good cause existed for the delay." *Fleming v. State*, 604 So. 2d 280, 299 (Miss. 1992) (citing *Wiley v. State*, 582 So. 2d 1008, 1012 (Miss. 1991)). This factor of length of delay weighs slightly in favor of Robinson. In addition to considering the aforementioned facts, this Court must also look at the time frame in which Robinson asserted his right to a speedy trial.

¶21. In *Wiley v. State*, 582 So. 2d 1008, 1012 (1991), the court held that a defendant has the responsibility of raising the speedy trial issue. "The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo*, 407 U. S. at 531-32.

¶22. In the case at bar, Robinson filed a motion to dismiss his indictment for failure to provide him a speedy trial on September 23, 1997, just three days before his trial. Robinson was indicted for two counts of uttering on or about December 16, 1994 and entered his waiver of arraignment and entry of a plea on March 28, 1995. The defense argues that even prior to September 23, 1997, they had requested a speedy trial; however, this is not entirely the truth. Prior to September 23, 1997, the record shows Robinson independently and without the advice of counsel from the public defenders office wrote Circuit Judge, Breland Hilburn. Robinson's letter encompassed problems he was having with counsel and his request for new representation. Additionally, although Robinson mentioned having his trial, his primary focus was obtaining counsel which would request and obtain bond for him.

¶23. Additionally, there is no evidence in the record to substantiate any claim of prejudice to the defendant.

In *Barker v. Wingo*, the court stated "[p]rejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id*. at 532.

¶24. Robinson argues that the delay prejudiced him in the following aspects: (1) he was unable to adequately prepare his case, and (2) since the State did not simultaneously prosecute Robinson on his four outstanding indictments he could not take the witness stand in his defense without the trial jury becoming aware of his previous convictions for similar crimes.

¶25. This Court holds that Robinson's first argument is without merit. In Robinson's brief he cited case law relative to trial delays and the inability to locate witnesses, or that even if found a witness's memory may be diminished; however, Robinson fails to complete his argument and show that any of these factors were present in his trial, and if present, how he was actually prejudiced by such factors. This Court additionally finds that Robinson's second argument relative to prejudice is without merit.

¶26. On September 23, 1997, the defense filed a motion *in limine* to exclude the evidence of four previous Hinds County convictions. In Robinson's motion to vacate conviction and incorporated memorandum of law, defense counsel states that in 1991 Robinson was indicted for felony uttering a forged instrument. The motion went on to state that on November 15, 1993, the Circuit Court of Hinds County entered a judgment of conviction in the case. Therefore, even without the most recent conviction in September 1996, the State still would have been able to impeach Robinson with the prior conviction of uttering a forgery. The record does not show evidence that weighs heavily against the State and warrants dismissing the charges on the basis of a denial of a speedy trial. This Court, therefore, finds that the trial court committed no error in denying his "Motion To Dismiss For Failure To Provide A Speedy Trial."

## IV. WHETHER THE PROSECUTION EXERCISED ITS PEREMPTORY JURY CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER IN VIOLATION OF THE SPIRIT OF *BATSON V. KENTUCKY, HATTEN V. STATE*

¶27. The fourth assignment of error is that the prosecution exercised its peremptory jury challenges in a racially discriminatory manner by using its peremptory strikes to remove members of the African-American race from possible trial jury service.

¶28. The defendant argued *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), as authority for debunking these strikes. *Batson* lists several elements which must be shown:

1. That he is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of venire men of his race, and

3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.

In sum, these components constitute the *prima facie* showing of discrimination necessary to direct the "state to come forward with a neutral explanation for challenging black jurors." *Id*.

¶29. In *Lockett v. State*, 517 So. 2d 1346, 1356-57 (Miss. 1987), the supreme court presented a list of race neutral reasons accepted by other courts throughout the country in an effort to provide guidance to trial judges in this state. Since *Lockett*, the supreme court has determined that service on a hung jury or a jury which returned a not guilty verdict, unemployment, and conviction of a family member are all racially neutral explanations. *See Harper v. State*, 635 So. 2d 864, 868 (Miss. 1994) (mistrial or not guilty verdict); *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993) (unemployment); *Griffin v. State*, 607 So. 2d 1197, 1203 (Miss. 1992) (conviction of family member). Additionally, the following have been determined to be race neutral reasons on which the use of a peremptory strike would be valid: *Taitano v. State*, 358 S. E. 2d 590 (Va. App. 1987)(lived near the defendant, lived in a "high crime" area, age, dress, demeanor); *Chambers v. State*, 724 S.W.2d 440, 442 (Tex.Ct.App. 1987) ( member of a fringe religious group, body English, age, marital status, handwriting, name association); *Hughes v. State*, 357 S.E.2d 80, 84 (Ga. 1987) ( more blacks knew about the case); *Rodgers v. State*, 725 S.W.2d 477, 480 (Tex.Ct.App. 1987) (prosecutor distrusted juror, inconsistency between oral responses and juror's card, failure to complete juror's card, relative in a contemporaneous criminal proceeding, employed by the police department); *Townsend v. State*, 730 S.W.2d 24, 26 (Tex.Ct.App. 1987) ( lack of eye contact and attentiveness, short term employment, single with children, indefinite answer on juror's card, illegible juror's card); *People v. Cartagena*, 513 N.Y.S.2d 497, 498 (N.Y. App. Div. 1987) (educational background, employment history, employment of spouse and children, criminal record). The State offered the following reasons for the peremptory strikes:

> MR. DE GRUY: Your Honor, we make a *Batson* objection at this time. The State has exercised all five challenges against African-Americans, and we ask that they bring forward race neutral reasons.

> THE COURT: All right.

> MR. BUCKLEY: Your Honor, Lawrence Jones, Panel 1, No. 3, was sleeping during Court's instructions and during voir dire. I never saw him raise up. I couldn't tell if he was awake or what was going on with him.

> Number two, Rhonda Johnson. She was inattentive and failed to make eye contact with me and would never nod one way or another in this manner.

> Number three, Flyod Tate. He teaches political science and sociology. We didn't want him getting back in the jury room and explaining things in a sociological manner to the jury in any way. In fact, Gracie White and Alma Irving, both of them were inattentive. Especially, Mrs. Irving. I could not get her to make eye contact with me in any way.

> Gracie White was not responsive to any questions, and it was as if I wasn't even speaking. And I chose to strike them for those reasons, Your Honor.

¶30. We must note that the trial court is experienced in conducting voir dire and having observed the demeanor of these four prospective jurors during the voir dire proceedings was in the best posture to decide whether these reasons given by the State were legitimate rather than pretextual. This Court has held that a circuit court's decision in this matter is entitled to great deference. We will reverse the circuit court's

*Batson* findings only where those findings are clearly erroneous and against the overwhelming weight of the evidence. *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987). "Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination. If the defendant makes no rebuttal the trial judge must base his decision only on the reasons given by the State." *Berry v. State*, 703 So. 2d 269, 294 (Miss. 1997) ( citations omitted). As stated in *Davis v. State*, 551 So. 2d 165, 172 (Miss. 1989), when defense counsel only alleges in general terms that peremptory strikes amount to *Batson* violations and there is no actual proffer of evidence concerning such violation, this Court is limited in its ability to reverse on this point. In the case at bar, counsel for Robinson only argued in general terms and, therefore, this Court is limited in its ability to reverse.

¶31. While the record fails to reflect the racial composition of the jury, we are cognizant of *Govan v. State*, 591 So. 2d 428, 430 (Miss. 1991), by which the Mississippi Supreme Court announced:

> The mere fact that a jury is white does not violate *Batson*; rather it is the racially discriminatory exercise of peremptory challenges to strike jurors from the jury that violates the *Batson* rule. *Suddeth v. State*, 562 So. 2d 67, 71 (Miss. 1990).

The record reflects that the judge had a hearing and required the prosecution to state race neutral reasons for the State's peremptory strikes and the prosecution was forthcoming with such reasons. The judge held that the State's reasons were racially neutral and accepted the representations of the prosecution as an officer of the court. The record does not reveal that the peremptory strikes were used in such a way as to violate the *Batson* rule. Accordingly, this assignment of error is without merit.

¶32. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION ON COUNTS I AND II OF UTTERING AND SENTENCES OF TWELVE YEARS EACH IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH SENTENCES TO RUN CONCURRENTLY, BUT CONSECUTIVELY TO ANY SENTENCE APPELLANT IS PRESENTLY SERVING IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, DIAZ, PAYNE, AND THOMAS, JJ., CONCUR. KING, P.J. DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J. IRVING, J., NOT PARTICIPATING.**

KING, P.J., DISSENTING:

¶33. I respectfully dissent from the majority as to issue IV, "Whether the prosecution exercised its peremptory jury challenges in a racially discriminatory manner in violation of the spirit of *Batson v. Kentucky*, and *Hatten v. State.*"

¶34. The State exercised its first five peremptory strikes against Black persons. At this point the defense raised a Batson objection, saying, "The State has exercised all five challenges against African-Americans, and we ask that they bring forward race neutral reasons." The court then required that the State offer race neutral reasons.

¶35. The persons stricken by the State and the reasons given are as follows:

> 1. Lawrence Jones, . . . was sleeping during the court's instruction and during the entire voir dire. I

never saw him raise up. "*I couldn't tell if he was awake or what was going on with him*"

2. Rhonda Johnson, "She was inattentive and failed to make eye contact with me and would never nod one way or another in this matter."

3. Floyd Tate, "He teaches political science and sociology. We didn't want him getting back in the jury room and explaining things in a sociological manner to the jury in any way."

4-5. "Gracie White and Alma Irving, both of them were inattentive. Especially, Mrs. Irving. I could not get her to make eye contact with me in any way.

Gracie White was not responsive to any questions, and it was as if I wasn't even speaking."

¶36. In response to these reasons, the court made the following finding: "Well it would be virtually impossible for the court to tell whether or not someone was making eye contact with someone else . . . . . I find that they would be racially neutral reasons and the court will accept the representation of the officer of the court."

¶37. The majority resolves this issue by saying, "We must note that the trial court, is experienced in conducting voir dire, and having observed the demeanor of these four prospective jurors during the voir dire proceedings, was in the best posture to decide whether these reasons given by the State were legitimate rather than pretextual. This court has held that a circuit court's decision in this matter is entitled to great deference."

¶38. While fact based findings are to be accorded deference, a finding of which the essence is, "It is impossible for me to know, so therefore I accept the representation of the prosecutor," is not the type of finding to which this court should defer. *Thorson v. State*, 721 So. 2d 590, 592, 94 (Miss 1998).

¶39. While the reasons given by the State are on their face race neutral, the trial court has an affirmative obligation to determine whether these reasons are mere pretext. *Id.* at 95 . The trial court did not honor that obligation and its findings therefore should not be given deference.

¶40. Even a cursory reading of the record indicates that the reasons given for the dismissal of at least four of these persons appear to be pretextual.

¶41. The State gave as its reason for dismissal of Lawrence Jones that he was asleep. However, it immediately follows that by saying it couldn't tell if he was awake. If you intend to dismiss a prospective juror for sleeping, it would appear that there is an obligation to ascertain that he is in fact sleeping.

¶42. If the State felt Mr. Jones was sleeping, it should have brought the matter to the attention of the judge or directed a question specifically to Mr. Jones, to test his attentiveness.

¶43. The reasons given by the State to justify its dismissal of Rhonda Johnson, Gracie White and Alma Irving were "they were inattentive and failed to make eye contact with me", and didn't respond to any questions.

¶44. There is no requirement that prospective jurors make eye contact with the prosecutor. If the prosecutor was concerned about the lack of eye contact, then it would have been a simple matter to request that they look at him so that he could have eye contact with them.

¶45. The last reason offered by the State is perhaps the most dubious of them all. That reason being they were not responsive to any questions.

¶46. Such a suggestion presumes that there were questions to which they should have responded. My reading of the record reveals no specific questions which were directed to Lawrence Jones, Rhonda Johnson, Gracie White or Alma Irving individually.

¶47. Since the State posed no individual questions, it must have been concerned about the failure to respond to the general questions posed to the panel. Those questions were as follows:

*1. The defendant is named Jeremiah Robinson and he is charged with this crime. Does anybody here know Jeremiah Robinson?*

¶48. It is clear that unless they knew Jeremiah Robinson, no response was required. There is nothing which suggested that they knew Jeremiah Robinson.

*2. The victim in this case is named Gus Primos. Does anybody in here know Gus Primos or his company?*

¶49. Again, it is clear that the question only required a response if they knew Gus Primos or his company. There is no suggestion that any of these persons knew Gus Primos or his company.

*3. Have any of you or your family members or close friends or co-workers been charged or convicted of a crime?*

¶50. Again, it is clear that this question only required a response if you met certain conditions. These conditions were either you, a family member, close friend or co-worker had been charged or convicted of a crime. There is nothing which suggests that these persons met either of these conditions.

*4. Does anyone feel this is a victimless crime?*

¶51. No response was required to this question unless it was felt that Jeremiah Robinson was charged with a victimless crime. There is nothing to suggest that any of these persons believed that.

*5. Is there anything that y'all are waiting for me to ask and I just never asked?*

¶52. This question is at best a poor effort at humor and at worst inane; which ever it is considered, no response was required.

¶53. When these matters are viewed as a whole, it is highly indicative of a pretextual motive, a motive which should not be credited by the allowance of these challenges.

¶54. Because the trial court failed to make the required findings that these matters were both race neutral and not pretextual, and because the record clearly establishes that they were pretextual, I would reverse and remand.

**COLEMAN, J., JOINS THIS OPINION.**